IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

CLAUDIUS and DAYNELLE BANKS,

        Plaintiffs,

    v.

OFFICER CHRISTIAN BERGE and THE
CITY OF PORTLAND,

        Defendants.

Case No. 3:16-cv-02129-AA
**OPINION AND ORDER**

_____

AIKEN, Judge:

    Plaintiffs Claudius Banks and Daynelle Banks filed this action against defendants Officer Christian Berge ("Officer Berge") and the City of Portland ("the City"), asserting that defendants violated their constitutional rights and state law in connection with a traffic stop. On April 17, 2017, I denied defendants' motion to dismiss, but granted their motion to order plaintiffs to make the allegations related to their federal law claims more definite and certain. *Banks v. Berge*, 2017 WL 1428709 (D. Or. Apr. 17, 2017). On August 15, 2017, plaintiffs filed their Third Amended Complaint (doc. 28) alleging Fourth Amendment and racial discrimination

claims against all defendants and state law claims against the City. Officer Berge and the City have separately moved for summary judgment on all of the claims. (docs. 46, 48). For the reasons set forth below, Officer Berge's motion is GRANTED in part and DENIED in part and the City's motion is GRANTED in part and DENIED in part.

## BACKGROUND

At approximately 2:00 am on March 21, 2015, plaintiffs, who are African American, were driving down NE Ainsworth Street in Portland, Oregon, on their way to Popeye's when Officer Berge drove up behind them and activated his overhead lights to initiate a traffic stop. Plaintiffs pulled into a nearby Popeye's parking lot. Officer Berge then approached the car and asked them to exit it, and plaintiffs complied. At some point during the stop, while plaintiffs were outside the car, Officer Berge broke the key off in the ignition, leaving the car inoperable. Officer Berge then left the scene, without issuing any citations. The stop lasted no longer than ten minutes. Because they could not drive the car, plaintiffs took a taxi home and had the car towed the next day.

The parties dispute what occurred immediately before the stop and exactly what happened during the stop itself.

According to Officer Berge, he was driving behind plaintiffs on March 21, 2015, when he observed their El Camino "twice drift entirely into the oncoming westbound lane of traffic and then back into the eastbound lane." Berge Decl. ¶ 6 (doc. 47). Those observations led him to believe that the driver was impaired and had violated two

traffic laws: (1) failure to drive within lane and (2) unlawful or unsignaled change of lane. *Id.* at ¶ 7. At that time, he could see that the car had two occupants, but could not make out their race or gender. *Id.* at ¶ 8. When Officer Berge approached the driver's side window, both plaintiffs appeared visibly intoxicated with "bloodshot and watery eyes" and "slurred" speech, and he could smell alcohol. *Id.* at ¶ 9. Because he believed that neither plaintiff could drive lawfully, Officer Berge asked them to exit their car. *Id.* at ¶ 10. Plaintiffs complied and gave Officer Berge the keys, and he entered the car to roll up the windows and secure the car. *Id.* While securing the car, Officer Berge accidentally broke the car key. *Id.* Officer Berge asserts that he did not search the car. *Id.*

Plaintiffs dispute many of the key details of Officer Berge's account. According to plaintiffs, Claudius Banks had returned from a long day of work when he and Daynelle Banks headed out on the drive. Claudius Banks Decl.¶ 4 (doc. 63). While driving, Claudius Banks did not drift into oncoming traffic. *Id.* at ¶ 6; Daynelle Banks Decl. ¶ 5, Jul. 23, 2018 (doc. 62). Neither plaintiff was intoxicated when Officer Berge stopped them and they did not smell of alcohol. Claudius Banks Decl. ¶ 5; Daynelle Banks Decl. ¶ 4, Jul. 23, 2018. In fact, plaintiffs both stated that they had not consumed alcohol "in the twelve hours prior to the incident." Claudius Banks Decl. ¶ 7; Daynelle Banks Decl. ¶ 6, Jul. 23, 2018. Officer Berge did not ask if Claudius Banks had been drinking or otherwise accuse him of intoxication or violating traffic laws. Claudius Banks Decl. ¶ 12. Instead, Officer Berge exited his vehicle and commanded, "Get your black ass out of the car." *Id.* at ¶ 8; Daynelle Banks Decl. ¶ 7,

Jul. 23, 2018. After plaintiffs complied, Officer Berge searched the vehicle "thoroughly, including the inside of the glove box." Claudius Banks Decl. ¶ 9. Officer Berge then "jerked and twisted the key at least three times until it broke off in the ignition" and exited the car. *Id.* at ¶ 10. Officer Berge left the scene without conducting field sobriety or breathalyzer tests on plaintiffs. *Id.* at ¶ 12.

Plaintiffs filed a complaint against Officer Berge with the Independent Police Review ("IPR") division of the City Auditor's office the following month. Daynelle Banks Decl. Ex. A at 6, Feb. 21, 2017 (doc. 16). In that complaint, plaintiffs alleged that Officer Berge engaged in racial profiling when he initiated the traffic stop, that the stop was unjustified, that Officer Berge's entry and search of the car was unlawful, and that Officer Berge's communication with plaintiffs was inadequate and rude. *Id.* After an investigation, the IPR decided to refer the complaint to the Portland Police Bureau's Internal Affairs ("IA") unit, which completed its investigation in November 2015. *Id.*; Daynelle Banks Decl. Ex. C, Feb. 21, 2017. Daynelle Banks also filed a "General Liability Claim Against the City of Portland" with the City's Risk Management division on May 22, 2015 to recover the cost of the taxi ride and towing from the City. Daynelle Banks Decl. Ex. A, Feb. 21, 2017.

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The materiality of a fact is determined by the substantive law on the relevant issue, while the authenticity of a dispute is determined by inquiring whether

a reasonable jury could return a verdict for the nonmoving party in light of the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). Any doubt about the existence of a genuine issue of material fact should be resolved against the moving party. *Celotex*, 477 U.S. at 339.

## DISCUSSION

In their Third Amendment Complaint, plaintiffs assert Fourth Amendment and racial discrimination claims under federal law against all defendants and false arrest and trespass to chattels claims under Oregon law against the City. Both Officer Berge and the City move for summary judgment on all of the claims against them. I will address each of their motions in turn.

## I.    *Scope of Summary Judgement Record*

The scope of the summary judgment record in this case is limited. To support his motion, Officer Berge submitted a declaration asserting his version of events. And

plaintiffs responded in kind, submitting declarations asserting their version of events. To support their *Monell* claims against the City, plaintiffs submitted two depositions. Kiel Decl. Ex. B & C (doc. 61). Plaintiffs also relied on the arguments that they made in their response to defendants' earlier motion to dismiss. As a result, the record also includes the evidence relevant to those arguments, which are found in the exhibits attached to Daynelle Banks' February 21, 2017 declaration. Daynelle Banks Decl. Ex. A-C, Feb. 21, 2017. Finally, plaintiffs offered evidence of Officer Berge's 2017 judgment of conviction for Official Misconduct in the First Degree. Kiel Decl. Ex. A. The parties dispute whether the Court should consider this conviction as part of the summary judgment record.

Plaintiffs assert that the Court should consider Officer Berge's prior misdemeanor conviction as evidence that bears on his credibility. In 2017, Officer Berge was found guilty of Official Misconduct in the First Degree, which is a Class A misdemeanor. ORS § 162.415(2). Although Officer Berge does not formally move to strike the evidence, he opposes plaintiffs' request and argues that credibility determinations are not appropriate for summary judgment.

At the summary judgment stage "the judge does not weigh conflicting evidence with respect to a disputed material fact. . . . Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. . . . These determinations are within the province of the factfinder at trial." *T.W. Elec. Serv.*, 809 F.2d at 630 (citations omitted). When direct evidence produced by the moving party conflicts with direct

evidence produced by the nonmoving party, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *Id.* at 631. And, if that fact is material to an issue, then summary judgment must be denied on that issue. *Id.*

Plaintiffs acknowledge that, ordinarily, credibility determinations are not made at the summary judgment stage. But plaintiffs argue that, in this case, the Court should consider the existence of evidence that bears negatively on Officer Berge's credibility because Officer Berge's motion relies entirely on his declaration.

When the parties present two different version of events, it is not appropriate for the Court to engage in credibility determinations at the summary judgement stage—credibility is an issue for the fact-finder. When versions of events differ on points of material fact, the summary judgment standard dictates the denial of the motion. Moreover, plaintiffs do not provide any authority to support their proposed exception to the general standard of review. Therefore, I decline to consider evidence related to Officer Berge's credibility at this stage.

## II.    *Officer Berge's Motion*

Plaintiffs allege two § 1983 claims against Officer Berge: (1) that Officer Berge stopped, detained, and searched their car in violation of the Fourth Amendment and (2) that he engaged in racial discrimination in violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000d, 42 U.S.C. § 3789d, and the Equal Protection Clause of the Fourteenth Amendment. Officer Berge moves for summary judgment on both claims, arguing

that there is no genuine issue of material fact and that he is entitled to qualified immunity.

## A. *Plaintiffs' Fourth Amendment Claim*

Plaintiffs allege that Officer Berge violated the Fourth Amendment when he stopped, detained, and searched their vehicle without justification.

A police officer may conduct an investigatory traffic stop if the officer has "reasonable suspicion" that a particular person "has committed, is committing, or is about to commit" a traffic violation. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000). Reasonable suspicion requires that officers have "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Id.* at 1105. An investigative stop is not subject to strict time limitations as long as the officer is pursuing the investigation in a "diligent and reasonable manner." *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985). An officer's conduct during the detention must be reasonably related in scope to the circumstances which justified the initial stop. *Terry*, 392 U.S. at 20. Officers may search cars involved in traffic stops if the officer has adequate justification for the search. For example, an officer may search inside of a car if the officer has reasonable suspicion that any passenger may be armed and dangerous. *Arizona v. Gant*, 556 U.S. 332, 346-47 (2009). Or, if there is probable cause to believe that a car contains evidence of a crime, an officer may search any area in the car where evidence might be found. *United States v. Ross*,

456 U.S. 798, 820-21 (1982). An officer may also search a vehicle pursuant to valid consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

Officer Berge states in his sworn declaration that he had reasonable suspicion that plaintiffs had committed three traffic violations: (1) failure to drive within a lane, in violation of ORS § 811.370; (2) unlawful lane change, in violation of ORS § 811.375; and (3) driving while under the influence of intoxicants, in violation of ORS § 813.010. Officer Berge also asserts that the length of and his conduct during the stop were reasonable, given his belief that plaintiffs were intoxicated. Finally, Officer Berge asserts that he did not search the car and argues that the length of the stop undermines plaintiffs' claim that he "thoroughly" searched the car.

Plaintiffs submitted their own sworn declarations challenging Officer Berge's version of events. Drawing all reasonable inferences in plaintiffs' favor, their declarations create genuine issues of material fact concerning the justifications for the stop and whether Officer Berge searched the car. Officer Berge argues that the declarations are not sufficient to establish a "genuine" dispute of facts because they "merely reiterate the facts alleged in their complaint." Berge Reply at 4 (doc. 65). But plaintiffs did not merely rely on the allegations in their complaint. Instead, plaintiffs responded to the evidence that Officer Berge submitted to support his motion by submitting their own declarations. And those declarations provide more than just conclusory statements that Officer Berge violated plaintiffs' Fourth Amendment rights by providing specific facts within plaintiffs' personal knowledge that contradicted Officer Berge's declaration.

In sum, genuine disputes of material fact remain that preclude the Court from concluding that no Fourth Amendment violation occurred during the stop.

## B. *Plaintiffs' Racial Discrimination Claims*

Plaintiffs allege that Officer Berge's stop and his conduct during the stop were motivated wholly or in part by racial animus, and that his actions violated (1) plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment, (2) 42 U.S.C. § 1981, (3) 42 U.S.C. § 2000d (Title VI of the Civil Rights Act of 1964), and (4) 42 U.S.C. § 3789d (renumbered as 34 U.S.C. § 10228 by the Omnibus Control of Crime and Safe Streets Act). Officer Berge argues that plaintiffs cannot establish that he intentionally discriminated against them and that the statutes cannot sustain plaintiffs' § 1983 action.

### 1. *Equal Protection Clause Violation*

To prove a § 1983 claim for a violation of the Equal Protection Clause, a plaintiff must establish that the defendant acted in a discriminatory manner and that the discrimination was intentional. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000). To avoid summary judgment, plaintiffs "must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the decision . . . was racially motivated." *Keyser v. Sacramento Unified Sch. Dist.*, 265 F.3d 741, 754 (9th Cir. 2001) (quotations omitted and alterations normalized).

Plaintiffs offered direct evidence of such discriminatory motive: Officer Berge's order to Claudius Banks to "Get your black ass out of the car." That kind of race-

related remark can create an inference of discriminatory motive. *See Sundaram v. Cnty. of Santa Barbara*, 39 F. App'x 533, 536 (9th Cir. 2002) (plaintiff's testimony that he was harassed in racial terms creates an inference that a police search was motivated by a discriminatory purpose); *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997) (supervisor's derogatory comments about people with the same national origin as plaintiff create inference of discriminatory motive).

Officer Berge argues that plaintiffs cannot establish that he intentionally discriminated against them because he could not see plaintiffs well enough to observe their race. He also denies that he said "Get your black ass out of the car" to plaintiffs. Both are factual questions for the jury to resolve at trial.

Officer Berge also argues that derogatory comments can only support an inference of discriminatory intent when combined with evidence of disparate treatment. That is incorrect. Officer Berge relies on *Cordova*, but that case does not support his proposition. Instead, in *Cordova*, the Ninth Circuit explained that a plaintiff in a Title VII case can create an interference of discriminatory motive either (1) through the *McDonell Douglas* framework by presenting evidence of disparate treatment or (2) by providing more direct evidence of discriminatory intent, such as derogatory racial comments. *Cordova*, 124 F.3d at 1148-49. In that case, the plaintiff did both, but that does not mean that plaintiffs were required to do so in this case.

Finally, after a plaintiff presents a prima facie case of discrimination, the burden shifts to the defendant to show that the conduct either did not have a discriminatory effect or was justified by some compelling purpose. *Sundaram*, 39 F.

App'x at 536; *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 n.21 (1977) (proof of discriminatory purpose shifts the burden to the defendant who must establish "that the same decision would have resulted even had the impermissible purpose not been considered"). Officer Berge argues that his conduct did not have a discriminatory purpose because it was justified by his reasonable suspicion that plaintiffs committed a driving violation and that they were intoxicated. But, as explained in Section (II)(A) above, the constitutionality of Officer Berge's actions under the Fourth Amendment depends on disputed facts.

In sum, the Court cannot conclude as a matter of law that no Equal protection violation occurred.

### 2.    *Section 1981 Violation*

Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  A defendant violates § 1981 if: (1) plaintiff is a member of a racial minority; (2) defendant intentionally discriminated against plaintiff because of his or her race; and (3) the discrimination involved one or more of the activities enumerated in the statute. *Keller v. City of Portland*, Case No. CV-98-263-ST, 1998 WL 1060222, * 12 (D. Or. Nov. 13, 1998)

First, Officer Berge argues that plaintiffs' § 1981 claim must fail because they cannot establish the second element – that he intentionally discriminated against

plaintiffs because of their race. I rejected that argument with respect to plaintiffs' Equal Protection Clause claim and reject this argument for the same reasons.

Second, Officer Berge argues that plaintiffs cannot establish the third element. He asserts that § 1981 is not a general anti-discrimination statute, but rather, prohibits discrimination only as it relates to the making and enforcement of contracts. Because plaintiffs' claims have no nexus to a contract, Officer Berge argues that § 1981 does not protect plaintiffs from the racial discrimination that they allege.

Plaintiffs respond that lower courts have applied § 1981 to claims of discrimination unrelated to the making or enforcement of contracts. Plaintiff relies on *Keller v. City of Portland*. In *Keller*, the plaintiff brought a § 1981 claim against the City of Portland, the Portland Police Bureau, and individual police officers for the shooting death of his son. The court recognized that "[c]laims brought under § 1981 usually involve the right to make and enforce employment contracts[,]" but ultimately found that "§ 1981 applies to situations of racially-motivated physical abuse and misuse of governmental power." *Id.* at *12, *14. The *Keller* court explained that "[l]imiting § 1981 to contractual matters, as urged by the defendants, fails to consider the 'equal benefits' and 'like punishment' clauses" of the statute. *Id.* at *14; *see also* 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws . . ., and shall be subject to like punishment[.]").

In reaching that conclusion, the *Keller* court relied, in part, on the Third Circuit's decision in *Mahone v. Waddle*. *Id.* at *12-13. In *Mahone*, the plaintiffs

alleged that police officers verbally and physically abused them, falsely arrested them, and gave false testimony against them because they are black. 564 F.2d 1018, 1028 (3rd Cir. 1977). The court looked to the plain meaning of section in light of the "expansive view of that section suggested by [its] legislative history" to conclude that the plaintiffs stated a claim under the equal benefit and like punishment clauses of section 1981. *Id.*

With respect to the statutory text, the *Mahone* court reasoned:

> The section takes the form of an enumeration of diverse rights: the right to make and enforce contracts, the right to sue, the right to be a party, the right to give evidence, and the right "to the full and equal benefit of all laws and proceedings for the security of persons and property." All persons are guaranteed these rights to the same degree as they are enjoyed by white persons. The statute then provides that all persons shall be subject to the same punishment as white persons are subject, to the same "pains" as white persons, to the same "penalties" as white persons, and to the same "taxes, licenses and exactions of every kind" as white persons, and that no person shall be subject to any punishment, pain, penalty, tax, license or exaction other than that to which white persons are subject. The statute can be read in no other way. To read the language of the statute as applying only to the right to contract ignores the clear and vital words of the majority of its provisions.

*Id.* at 1027–28. The court concluded: "[d]espite the sparsity of precedent, a natural and commonsense reading of the statute compels the conclusion that section 1981 has broad applicability beyond the mere right to contract." *Id.* at 1028.

The court then explained how "evidence of the contemporary understanding of the Civil Rights Act of 1866, the Act from which section 1918 derives[,]" supported its conclusion that the section should be liberally construed. *Id.* The purpose of the Act was "to abolish all the remaining badges and vestiges of the slavery system." *Id.* at 1030. Reviewing the legislative history of that Act, the explained that Congress

viewed the Act as "a complete statutory analog to the thirteenth amendment. The Act was not intended to have merely limited effect; rather, it was to eradicate all discrimination against blacks and to secure for them full freedom and equality in civil rights." *Id.* at 1028. The court described how the bill's opponents also recognized "the broad sweep and power of the Act." *Id.* And the court concluded that "[t]he Congressional debates thus support our conclusion that the Act's successor, section 1981, applies on its face to" racially-motivated physical abuse and misuse of government power. *Id.*

Although, neither the Ninth Circuit nor the Supreme Court has considered the meaning of the "equal benefit" and "like punishment" clauses of § 1981, other courts of appeal that considered the question have held that "misuse of governmental power motivated by racial animus comes squarely within the 'equal benefit' and 'like punishment' clauses" of § 1981. *Alexis v. McDonald's Rests. Of Mass., Inc.*, 67 F.3d 341, 348 (1st Cir. 1995) (recognizing that "all courts of appeals which have considered the question have held" consistently with *Mahone*). Many courts in other districts also embrace this broad interpretation of § 1981. *See Singh v. Bunch*, No. 1:15-cv-00646-DAD-BAM, 2017 WL 117857, *6 (E.D. Cal. Jan. 11, 2017) (concluding that the plaintiffs' allegations of defendants' racial discrimination in their law enforcement activities fall within § 1981's equal benefit and like punishment clauses and listing cases from other districts that have recognized the same right).

The court finds the reasoning in those cases, and in *Keller*, persuasive and, therefore, also finds that the "equal benefit" and "like punishment" clauses of § 1981

protect plaintiffs against racial discrimination by police officers. Accordingly, Officer Berge's Motion for Summary judgment on this ground is denied.

### 3. *Title VI Violation*

42 U.S.C. §2000d, Title VI of the Civil Rights Act of 1964, provides

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Officer Berge argues that individuals cannot be held liable under Title VI. He relies on the Ninth Circuit's statement of the elements of a Title VI in *Fobbs v. Holy Cross Health System Corp.*: "(1) the entity involved is engaging in racial discrimination, and (2) the entity involved is receiving federal financial assistance." *Fobbs*, 29 F.3d 1439, 1447 (9th Cir. 1994), *overruled in part on other grounds by Daviton v. Columbia/HCA Healthcare Corp.*, 241 F. 3d 1131 (9th Cir. 2001). Other courts have held that, because Title VI forbids discrimination in a "program," individuals cannot be held liable under Title VI. *See Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011) ("Individual liability may not be asserted under Title VI."); *Shotz v. City of Plantation*, 344 F.3d 1161, 1171 (11th Cir.2003) ("It is beyond question . . . that individuals are not liable under Title VI."). Plaintiffs have pointed the court to no cases, and the Court has found none on its own, holding that an individual may be sued under Title VI.

Plaintiffs' only response is that they allege a claim under § 1983 for a violation of Title VI, not a direct claim under Title VI. But the fact that plaintiffs chose to use § 1983 to vindicate their Title VI rights does not relieve them of their burden to

establish a Title VI violation. Accordingly, Officer Berge is entitled to summary judgment on this ground.

### 4. *Safe Streets Act Violation*

Finally, 34 U.S.C. § 10228 (formerly 42 U.S.C. § 3789d) is a provision of the Omnibus Crime Control and Safe Streets Act ("the Safe Streets Act") that prohibits discrimination by any program or activity funded by the Act. A person bringing a civil action under the Act must first exhaust their administrative remedies by filing a complaint with the Office of Justice Program or "any other administrative enforcement agency." 34 U.S.C. § 10228(c)(4)(A). Officer Berge argues that plaintiffs failed to establish a violation of the Safe Streets Act because (1) they have not identified any program funded by the Act that is connected to the discrimination alleged in the First Amended Complaint and (2) they failed to allege, and cannot present, evidence that they exhausted their administrative remedies. Plaintiffs respond that they brought their claim under § 1983 not directly under the Safe Streets Act. But even if § 1983 relieved plaintiffs of the exhaustion requirement, there is no evidence that the alleged discrimination was related to a program or activity funded by the Safe Streets Act. Officer Berge is also entitled to summary judgment on this ground.

### C. *Qualified Immunity*

Officer Berge also asserts that he is entitled to summary judgment on both claims on the basis of qualified immunity. The doctrine of qualified immunity protects government officials from liability unless (1) they violated a federal statutory

or constitutional right, and (2) the right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A right is "clearly established" when, at the time of the challenged conduct, "existing precedent . . . placed the statutory or constitutional question beyond debate." *Id.* at 741. An officer's conduct is evaluated in light of the particular circumstances before the officer. A "clearly established" rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Both prongs of the qualified immunity inquiry involve questions of law that courts may answer in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, genuine disputes of material fact preclude the application of qualified immunity at this stage of the proceedings.

First, as discussed above, viewing the evidence in the light most favorable to plaintiffs, questions of material fact remain regarding whether the alleged constitutional violations occurred. Accordingly, I cannot conclude that Officer Berge is entitled to qualified immunity as a matter of law on the first prong of the qualified immunity inquiry.

Second, I cannot determine whether a reasonable officer in Officer Berge's position would not have understood that his conduct violated plaintiffs' rights under the Fourth Amendment and Equal Protection Clause. Nearly all decent officers know that the Fourth Amendment does not permit racially motivated searches and seizures and that such conduct would violate the Fourteenth Amendment's equal protection

principles. Although it is true that Officer Berge's conduct would not violate a clearly established right if he acted precisely as he represents in his sworn declaration, there is no question that he would be violating a clearly established right if the facts are as plaintiffs represent. Questions of fact remain regarding both the circumstances that Officer Berge faced and the conduct that Officer Berge engaged in during the stop. Those factual disputes preclude the Court from defining, with specificity, the "right" that Officer Berge allegedly violated and from determining, as a matter of law, whether that right was clearly established. *See, e.g., Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993) (qualified immunity may be precluded at the summary judgment stage if there are genuine disputes over (1) the facts and circumstances within an officer's knowledge and (2) what conduct underlies the alleged violation). Viewing the evidence in the light most favorable to plaintiffs, a reasonable officer certainly would have known that it was unlawful to stop a car, detain its occupants, and search it without any evidence to justify those actions and based, instead, on the race of the occupants. *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 663 (1977) (requiring "at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law" in order to stop an automobile and detain the driver). Therefore, qualified immunity cannot be granted at this stage.

## III. *The City's Motion*

Plaintiffs allege four claims against the City, all of which are based on Officer Berge's conduct: (1) a § 1983 claim alleging municipal liability for violations of

plaintiffs' Fourth Amendment rights; (2) a § 1983 claim alleging municipal liability for statutory and Equal Protection violations based on racial discrimination; (3) a false arrest claim under Oregon common law; and (4) a trespass to chattels claim under Oregon common law.

The City moves for summary judgment on all four claims. The City argues that plaintiffs' federal claims should fail because plaintiffs cannot establish that a municipal custom or policy caused Officer Berge's alleged constitutional violations and because Officer Berge did not violate plaintiffs' rights. Next, the City argues that plaintiffs' false arrest claim should fail because plaintiffs did not provide the City adequate notice under the Oregon Tort Claims Act. Finally, the City argues that plaintiffs cannot establish a genuine dispute of material fact for either state law claim.

### A.    *Monell Liability*

A "municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original). "[W]hen execution of a government's policy or custom . . . inflicts the injury . . . the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1979). Absent a formal government policy, a plaintiff must show a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992) (internal quotation marks omitted). The custom must be so "persistent and widespread" and

so "permanent and well settled" as to practically have the force of law. *Monell*, 436 U.S. at 691. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *modified by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001).

Plaintiffs allege that Officer Berge's actions were part of the Portland Police Bureau's pattern and practice of racial profiling in conducting unjustified stops, detentions, and searches disproportionately directed at African-Americans. In its motion for summary judgment, the City asserts that plaintiffs cannot establish that such a custom exists. In response, plaintiffs submitted the depositions of two officers in the Portland Police Bureau's Gang Enforcement Unit, which were conducted on September 21, 2016, as part of discovery in a case involving a "similar claim." Pl. Resp. to City's Mot. for Summary J. at 2 (doc. 60).

The depositions fail to identify specific facts demonstrating a genuine issue for trial. They do not contain any evidence from which a jury could find that Portland police officers regularly conduct unjustified traffic stops. Similarly, the depositions fail to show that racial bias has so infected the Portland Police Bureau that a jury could find that there is a municipal policy or custom of permitting racially motivated traffic stops and vehicle searches.

In the first deposition, Officer Andrew Polas briefly discussed the role that traffic stops play in carrying out the mission of the Gang Enforcement Unit. Officer

Polas explained that, unlike patrol officers, gang enforcement officers respond only "to gang-related crimes[,]" and that he regularly stops cars for traffic violations and asks to search the vehicle because part of his job is to "do self-initiated activity, to try to take guns off the street [to] prevent gang members from killing one another." Kiel Decl. Ex. C at 2. Because stops serve a narrow purpose in the gang enforcement context, Officer Polas acknowledged that he was selective about who he stopped for traffic violations. *Id.* Officer Polas explained that "we always have a traffic violation on the car" before stopping it, but "our goal is to try and stop gang members." *Id.* He stated that because "95 percent of the gang-related activity [in Portland] is African-American men shooting at other African-American men[,]" a "large percentage of the people we stop are African-American[.]" *Id.*

In the second deposition, Officer Charles Asheim explained the differences between his work on patrol and his work in gang enforcement. As a patrol officer, Officer Asheim was assigned to a district and was responsible for responding to calls, assisting other officers, and doing his own proactive work all within that geographical area. Kiel Decl. Ex. B at 2. In gang enforcement, the mission is "to prevent and investigate gang violence in the city of Portland." *Id.* at 3. To prevent gang violence, gang enforcement officers work to build relationships and rapport with people involved in gangs and their family members "by interacting with people over and over again." *Id.* Officer Asheim acknowledged that he sometimes used traffic stops to do that. *Id.* at 3-4. Although he did not want to "give . . . the impression that I've never looked the other way on a traffic violation" when patrolling, Officer Asheim explained

that he routinely stops people for traffic violations to try to contact people that may be involved in gang-related crime. *Id.* at 4. Finally, when asked if he had heard that young black men in Portland complain about being stopped for no cause, Officer Asheim testified: "I believe it is possible it happens. It's definitely not my practice or the practice of the Gang Enforcement Team or people I work with, but I believe it's possible." *Id.* at 5.

Although I find Officer Polas' testimony about the demographics of gang-involved people in Portland and, by extrapolation, people stopped by gang unit officers to be troubling, at most it suggests that race is one of the many criteria officers in the Gang Enforcement Unit use to decide whether to stop a car for traffic violations. That unit consists of 15 officers and has a unique mission compared to other units in the Police Bureau. And Officer Asheim's testimony specifically emphasized the differences between the Gang Enforcement Unit and Officer Berge's unit, the Patrol Unit. Finally, both officers testified that they only stop cars after observing a traffic violation or when they had other legal grounds for the stop.

In sum, the record contains no evidence to support plaintiffs' assertion that Portland Police Bureau had a "persistent and widespread" custom or a "permanent and well settled" policy of either conducting suspicion-less traffic stops, detentions, and searches or permitting racially motivated traffic stops, detentions, and searches.

Accordingly, summary judgment is appropriate for plaintiffs' *Monell* claims – regarding Fourth Amendment violations and racial discrimination – against the City of Portland.

**B.** *Supplemental Jurisdiction over Pendent State Law Claims*

Because the City is entitled to summary judgment on all federal claims, before proceeding to the City's arguments regarding plaintiff's remaining state law claims, I must first consider whether to exercise supplemental jurisdiction over the claims. Neither party raised the issue of supplemental jurisdiction, so such an analysis is not required. *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc). But the Ninth Circuit has stated that when it comes to supplemental jurisdiction over state claims, "the proper administration of justice is far better served by a deliberate decision than by default." *Id.* at 1001. I therefore address the question *sua sponte*.

28 U.S.C. § 1367(a) provides the basis for supplemental jurisdiction:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

The court has discretion to "decline to exercise" supplemental jurisdiction in various circumstances, including when "the district court has dismissed all claims over which it had original jurisdiction[.]" 28 U.S.C. § 1367(c)(3).

The Supreme Court has explained that in the "usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). But there is no "mandatory rule to be applied inflexibly in all cases." *Id.* Ultimately, whether to retain jurisdiction

when § 1367(c) is triggered remains a discretionary decision, informed by considerations of "economy, convenience, fairness, and comity." *Acri*, 114 F.3d at 1001.

Under the circumstances presented here, I find that the values enumerated above weigh in favor of retaining jurisdiction over the state law claims. Discovery is complete and the summary judgment motions have been fully briefed and argued. It would be a waste of judicial resources to require the parties to start over in state court on the false arrest and trespass to chattels claims. Finally, the plaintiffs' claims present no novel or difficult questions of state law. I will therefore continue to exercise supplemental jurisdiction over plaintiffs' state law claims.

### C. *Plaintiffs' False Arrest Claim*

Plaintiffs alleged that Officer Berge's unlawful stop and detention constituted a false arrest under Oregon common law. The City argues that plaintiffs' claim should fail because they did not provide the City with adequate notice of their false arrest claim and because plaintiffs cannot establish that they were "arrested" under Oregon law or that Officer Berge's actions were unlawful.

### 1. *Adequate Notice under the OTCA*

The Oregon Tort Claims Act ("OTCA"), ORS §§ 30.260 to 30.300, provides an exclusive remedy for plaintiffs seeking to pursue a tort claim against a public body in Oregon. The OTCA requires a plaintiff to provide proper notice of a claim, and a plaintiff's failure to do so deprives the plaintiff of the right to make a claim against a public body. ORS § 30.275(1); *Tyree v. Tyree*, 840 P.2d 1378, 1380 (Or. Ct. App. 1992).

A plaintiff may satisfy the notice requirement by providing "formal notice," "actual notice," or by commencing an action within 180 days after the alleged loss or injury. ORS § 30.275(2)(b), (3). "The purpose of the notice requirement of ORS § 30.275 is to allow the public body an opportunity to investigate a matter promptly and to settle all meritorious claims without litigation." *Flug v. Univ. of Oregon*, 13 P.3d 544, 551 (Or.Ct.App.2000); *accord Urban Renewal Agency of City of Coos Bay v. Lackey*, 549 P.2d 657, 660 (Or. 1976).

The City argues that the General Liability Claim Form that Daynelle Banks submitted to the City's Risk Management Division was insufficient to provide formal notice of plaintiffs' false arrest claim because the form references only the expenses related to the broken key and towing the vehicle. The City also argues that the form failed to provide actual notice because it did not convey plaintiffs' intent to pursue a false arrest claim.

Both "formal notice" and "actual notice" require plaintiffs to provide a communication that conveys both "a description of the time, place and circumstances giving rise to the claim" and their intent to assert "a claim" against the public body. *Compare* ORS § 30.275(4) (the requirements for formal notice) *with* ORS § 30.275(6) (requirements for actual notice). Those requirements are the only ones that the City argues are lacking in this case. And, having reviewed the record in this case, I find that, by submitting the form to the City's Risk Management Division on May 22, 2015, plaintiffs satisfied the other requirements for formal and actual notice.

In the context of actual notice, the Oregon Supreme Court has held that the communication must provide "the time, place, and circumstances 'giving rise to' the ultimate claim," but it need not set forth the "specific nature or theory of the claim." *Flug v. Univ. of Oregon*, 73 P.3d 917, 924 (Or. 2003). In *Flug*, the court reasoned that, "[a]lthough the notice also must warn of the plaintiff's intent to bring '*a* claim,' the use of that term demonstrates that the warning need not specify precisely *what* claim." *Id.* (emphases in original).

Plaintiffs' form indicates that the incident took place at 2:00am on March 21, 2015 at the Popeye's on the "corner of MLK and NE Ainsworth." Daynelle Banks Decl. Ex. A at 2, Feb. 21, 2017. In the section of the form asking for a description of the incident, plaintiffs began by referring to documents related to the Independent Police Review and Internal Affairs investigations that were conducted after plaintiffs filed a complaint with the Independent Police Review Bureau. *Id.* The documents were also attached to the form. Two of those documents summarized the allegations of an unlawful stop and search, among others, that plaintiffs made in their Independent Police Review complaint. *Id.* at 6; Daynelle Banks Decl. Ex. C at 3, Feb. 21, 2017. Plaintiffs' form also summarizes the incident: "Officer Christian Berge broke they key of our car causing it to be towed. We had to pay to get car out of impound and taxi to get home. . . . The officer conducted an unlawful search and broke the car key." Daynelle Banks Decl. Ex. A at 2, Feb. 21, 2017. The contents of plaintiffs' form and the allegations summarized in the attached documents – particularly allegations that Officer Berge conducted an unlawful traffic stop and

search – sufficiently described the circumstances giving rise to plaintiffs' false arrest claim.

The form also adequately conveys plaintiffs' intent to litigate. The form itself is a City of Portland form titled "General Liability Claim Against the City of Portland." *Id.* Under the title it states "*\*for damages to persons or property\**" and references the statutory period for timely notice and highlights the proper party to whom notice must be given: "*A claim must be filed with* **City of Portland Risk Management** *within 180 days after the occurrence of the incident or event.*" *Id.* (emphasis and boldface in original). The title and instructions on the form indicate that the City intended the form to serve as formal notice under the OTCA and that the City would understand that, by submitting the form, a person intends to pursue "a claim" against the City based on the incident described on the form.

Because plaintiffs' form described the circumstances giving rise to plaintiffs' false arrest claim and conveyed their intent to pursue a claim against the City, plaintiffs satisfied the OTCA's notice requirement. The City is not entitled to summary judgment on this basis.

### 2. *Merits of Plaintiffs' False Arrest Claim*

The City argues that plaintiffs' false arrest claim fails because plaintiffs were "stopped" not "arrested" under Oregon law and the Fourth Amendment. But, as plaintiffs point out, the tort of false arrest does not require an arrest in the criminal sense. Instead, a plaintiff must establish an "imposition of unlawful restraint on another's freedom of movement." *Lukas v. J.C. Penny Co.*, 378 P.2d 717, 720 (Or.

1963). "The confinement required to establish a cause of action for false imprisonment may be accomplished by actual or apparent physical barriers, compulsive physical force, a threat to apply physical force or assertion of legal authority[.]" *Walker v. City of Portland*, 693 P.2d 1349, 1352 (Or. Ct. App. 1985) (internal citations omitted). In this case, the undisputed facts establish most of the elements of the tort. Plaintiffs were restrained during the stop and that restraint was accomplished by Officer Berge's assertion of legal authority. The only question is whether the restraint was lawful.

The City also argues that Officer Berge lawfully stopped plaintiffs under ORS § 131.615 and the Fourth Amendment. The purpose of ORS § 131.615 is to protect "interests of the kinds which are protected by the Fourth Amendment to the United States Constitution and Article I, section 9, of the Oregon Constitution." *State v. Valdez*, 561 P.2d 1006, 1011 (Or. 1977). The statute authorizes officers to stop a person and make a "reasonable inquiry" when the officer "reasonably suspects that a person committed or is about to commit a crime." ORS § 131.615(1). As explained in Section (II)(A), whether Officer Berge had reasonable suspicion to stop plaintiffs' car and whether the subsequent detention and inquiry was reasonable depends on facts that are in dispute. Accordingly, viewing the evidence in the light most favorable to plaintiffs, I cannot conclude that plaintiffs' false arrest claim fails as a matter of law.

### D.  *Plaintiffs' Trespass to Chattels Claim*

Plaintiffs allege that Officer Berge's "deliberate disabling" of plaintiffs' car constitutes trespass to chattels. In Oregon, the elements of a trespass to chattels

claim are essentially the same as a claim for conversion, which is "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Mustola v. Toddy*, 456 P.2d 1004, 1007 (Or. 1969) (quoting Restatement (Second) of Torts § 222A (1965)). The only arguable differences between the two torts are the extent of the interference and remedy. *Scott v. Jackson Cty.*, 260 P.3d 744, 752 (Or. Ct. App. 2011).

First, the City argues that plaintiffs' claim cannot succeed because Officer Berge did not intentionally break the car key. But, to establish a trespass to chattels claim, plaintiffs do not need to prove that Officer Berge intended to break the key, but rather that Officer Berge took some intentional act – that is, acted purposefully – in a way that resulted in the exercise of dominion or control over the key and car. *Francis v. Farnham*, 648 P.2d 1349, 1351 (Or. Ct. App. 1982) ("It is not necessary for the tort of conversion that harm done to the chattel be done intentionally. In fact, purely accidental harm to a chattel may constitute conversion if the actor has intentionally exercised dominion or control over that chattel."). Under either version of events, Officer Berge intentionally exercised control over the key when he grabbed and turned it.

Second, the City argues that breaking the key did not interfere with plaintiffs' possession of the vehicle or the physical condition of the vehicle. The City asserts that the evidence indicates that plaintiffs went home after the stop ended and plaintiffs had a second key to the car. The City's arguments address the severity of

Officer Berge's interference, and thus the amount of damages plaintiffs could be entitled to, not whether Officer Berge committed trespass to chattels. Therefore, the City is not entitled to summary judgment on this claim.

## CONCLUSION

Officer Berge's Motion for Summary Judgment (doc. 46) is GRANTED with respect to plaintiffs' claims 42 U.S.C. § 2000d (Title VI) and 42 U.S.C. § 3789d (renumbered as 34 U.S.C. § 10228) claims and DENIED with respect to plaintiffs' Fourth Amendment, Equal Protection Clause, and 42 U.S.C. § 1981 claims. The City's Motion for Summary Judgment (doc. 48) is GRANTED with respect to plaintiffs' Fourth Amendment and racial discrimination claims and DENIED with respect to plaintiffs' state law claims.

IT IS SO ORDERED.

DATED THIS 18th day of March 2019.

_Ann Aiken_
Ann Aiken
United States District Judge